RONALD SLADE, individually
and as Special Administrator of the
ESTATE OF KAMONIE M. SLADE and
CHARAMA SLADE

        Plaintiffs,                CASE NO: 11-CV-222

   v.

BOARD OF SCHOOL DIRECTORS OF THE CITY OF MILWAUKEE
LINDA ROUNDTREE
MARIBETH GOSZ
KEITH P. POSLEY
JOHN PITTA

        Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The plaintiffs have executed a stipulation for the dismissal of all claims against the defendant, Keith Posley, with prejudice, and for the dismissal of all federal constitutional claims (Counts I and II) against the defendant, John Pitta, with prejudice. The plaintiffs have also executed a stipulation dismissing Count II of the Plaintiffs' Complaint, alleging a violation of the plaintiffs' right to equal protection under the law as guaranteed by both the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 (¶¶'s 29-35 of Plaintiffs' Complaint). Consequently, the only issue for resolution by this court on summary judgment is whether the defendants, Mary Beth Gosz and Linda Estes[1], are entitled to summary judgment dismissing

---

[1] Subsequent to the death of Kamonie Slade, the defendant, Linda Roundtree, married and changed her name to Linda Estes. For the purpose of continuity the defendant will be referred to

Count I of the Complaint alleging violation of the plaintiffs' right to substantive due process as guaranteed under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

The plaintiffs' substantive due process claims are grounded in the "state created danger" theory. The state created danger theory recognizes that the Due Process Clause imposes a duty on state actors to protect an individual from danger when the state affirmatively places that individual in a position of danger the individual would not otherwise have faced. To recover under the state created danger theory, a plaintiff must demonstrate that: 1) the state, by its affirmative acts, created or increased a danger faced by an individual; 2) the state's failure to protect that individual from such a danger was the proximate cause of the injury to the individual; and 3) the state's failure to protect the individual "shocks the conscience." <u>King v. East St. Louis School District 189</u>, 496 F.3d 812, 817-18 (7th Cir. 2007).

## FACTUAL BASIS FOR CONSTITUTIONAL CLAIM

Kamonie Slade (Slade) was a 12 year old student in the seventh grade at the Roosevelt Middle School for the Arts (Roosevelt) at the time of his death. He drowned while swimming in Mauthe Lake in Fond du Lac County while in full view of a teacher, while attending a school field trip on the last day of school for the seventh grade class. In order to understand the basis for the plaintiffs' constitutional claims, it is important to understand how Slade ended up in Mauthe Lake in conditions that allowed him to drown. Viewing the facts in a light most favorable to the non-moving party, below is a summary of the facts leading up to the tragic death of Kamonie Slade.

The field trip had been planned, in part, by the assistant principal at Roosevelt, Maribeth Gosz (Gosz), and approved by the principal, Linda Estes (Estes). Plaintiffs' Additional Proposed

---

as "Estes" in this Memorandum, although in discovery she is identified by her prior name of Linda Roundtree.

Facts, ¶ 11, Defendants' Proposed Facts, ¶ ¶ 16, 63. The trip was planned weeks in advance of the last day of school as an incentive based trip for students without suspension who were moving up to the eighth grade. Defendants' Proposed Facts, ¶ 5. In the planning process for the trip, it was discussed and decided that the children would be allowed to swim in the lake as part of the activities for the day. Plaintiffs' Additional Proposed Facts, ¶ 12, 19. Permission slips were circulated to the parents of the students asking that the students bring "sunscreen, water bottles, swimsuits, [and] towel" and asked specific permission of each parent to allow their child "to play in the water." Plaintiffs' Additional Proposed Facts, ¶ 13.

The Milwaukee Public School District, at the time of the planning of the trip, had specific procedures in place that addressed what precautions were necessary for one day field trips involving swimming activities. MPS Administrative Procedure 7.30, "Field Trips and Excursions" specifically indicated:

> (k)     No "recreational swimming" (including, but not limited to, pools at motels, hotels, or water parks, lakes, parks, etc) is allowed as part of a field trip experience unless appropriate certified life-saving trained staff is on duty and the activity is supervised by MPS staff.

Plaintiffs' Additional Proposed Facts, ¶ 2. The requirement that "certified life-saving trained staff" be present means that a lifeguard must be present on any field trip involving swimming activities. Plaintiffs' Additional Proposed Facts, ¶ 37. This Administrative Procedure existed in tandem with a companion memorandum that was available to all administrative staff at the beginning of the 2009-2010 school year that provided:

> **It is extremely important that before a student is allowed to participate in a field trip swimming activity, the parent or guardian be contacted to confirm if the child has any previous swimming experience.** There should be a statement to that effect on the parent/guardian permission slip before the child attends the field trip. No recreational swimming is allowed as part of the field trip experience unless appropriate lifesaving trained personnel are on duty and the activity is supervised by MPS staff.

Plaintiffs' Additional Proposed Facts, ¶¶ 3, 4. The safety precautions outlined in the

Administrative Procedure and companion memorandum were mandatory. There was no discretion allowed on the part of staff or administrators. Plaintiffs' Additional Proposed Facts, ¶¶ 2, 5. These precautions were instituted by MPS as a safety measure because of the risk associated with allowing children into the water without proper supervision. Plaintiffs' Additional Proposed Facts, ¶ 6.

Estes, the school principal responsible for approving the field trip, was well aware of the safety precautions outlined in the Administrative Procedure and companion memorandum before the field trip. Defendants' Proposed Facts, ¶¶ 54, 55. The assistant principal, Gosz, was also aware of these precautions and related documents as she also received a copy of the Administrative Procedure 7.30 at the beginning of the school year, and signed off verifying receipt. In fact, Gosz was asked by Estes to provide a presentation to staff on Organization Day (the beginning of the school year orientation) on August 29, 2009, on the subject of field trips. During that presentation, Administrative Procedure 7.30 was specifically discussed. Plaintiffs' Response to Defendants' Proposed Facts, ¶ 9; Plaintiffs' Additional Proposed Facts, ¶ 8.

Both Gosz and Estes understood that the safety precaution requiring the presence of a lifeguard when there are swimming activities was a safety precaution based on the risk of serious injury or death associated with allowing children in the water without proper supervision. Plaintiffs' Additional Proposed Facts, ¶¶ 9, 10. In fact, when swimming activities are involved, the school district encourages the purchase of accidental injury insurance because of the "riskier" nature of the activity. Plaintiffs' Additional Proposed Facts, ¶ 27. With regard to the Mauthe Lake field trip, the parents were charged 50 cents for the accidental injury insurance, but the insurance was never actually purchased for the trip. Plaintiffs' Additional Proposed Facts, ¶ 28.

4

When Gosz submitted the application for approval of the field trip to principal Estes, Estes read the portion asking parents for permission to allow their children to "play in the water" and advised Gosz to strike that language from the permission slip. During that conversation, Estes made it clear that "students shouldn't be near the water" because she was concerned that allowing children in the water without someone who is licensed and certified could "put kids in harm's way." Plaintiffs' Additional Proposed Facts, ¶ 16. Gosz denies that there was ever any discussion regarding water activities with principal Estes before the field trip took place. Defendants' Proposed Facts, ¶ 17.

On June 14, 2010, the seventh grade class, including Slade, was transported from Roosevelt Middle School by bus to Mauthe Lake. Gosz had been to Mauthe Lake before, and was aware that there was no resident lifeguard on duty. Plaintiffs' Additional Proposed Facts, ¶ 14. She was also aware that the water in the designated swimming area was deep enough to be over her students' heads and that visibility in the lake water could be an issue. Id. She had no information on the topography of the lake bed, changes of depth in the water or the currents in the water. Plaintiffs' Additional Proposed Facts, ¶ 15. She also had no information on the swimming ability of any of the students or staff. Plaintiffs' Additional Proposed Facts, ¶ 25. Despite knowing that there was no lifeguard present, Gosz proceeded with her plan to allow children to swim in the lake as part of the day's activities, which was in direct violation of the School District procedures and in direct violation of the directives of the school principal..

In the morning before lunch, swimming was the main activity amongst the children, with half of the kids on the trip entering the lake. Plaintiffs' Additional Proposed Facts, ¶ 19. After lunch, one of the teachers, John Pitta (Pitta), was down by the lake edge when he saw six children, including Slade, near the water's edge. Gosz asked Pitta to "watch these students" and

then proceeded back up to the picnic area. Plaintiffs' Additional Proposed Facts, ¶ 20. When she gave this directive to Pitta, she had no information on his level of training in first aid and didn't even know if he could swim. Plaintiffs' Additional Proposed Facts, ¶ 24. Pitta had no idea whether any of the children, including Slade, could swim. Plaintiffs' Additional Proposed Facts, ¶ 22. He also had no information on the topography of the lake bed, changes in water depth in the lake, currents in the lake or any other potential hazards. Plaintiffs' Additional Proposed Facts, ¶ 23.

While in the water, Slade, who was not a good swimmer, along with a number of other students, walked to an area where the water was chest deep. The students, including Slade, then proceeded to walk to a deeper area of the lake where the depth of the water was such that Slade could stand on the bottom with his shoulders and head above the water. Slade, upon reaching this spot in the lake, began to be drawn, either by the downward sloping terrain of the lake bed and/or the current of the water, into a portion of the lake where the water was above his head. When Slade was drawn into the deeper portion of the lake, he began to struggle to get into more shallow water and keep his head above the surface so that he could continue to breath. Other students nearby Slade made futile efforts to rescue him. Unfortunately, as a result of the terrain and/or current, Slade drifted into deeper water and, after a period of struggle above the water that lasted approximately 30 seconds, Slade slipped beneath the water and eventually drowned. These tragic events would have been visible from the shore. Plaintiffs Complaint, ¶ 18.

There is significant evidence, as outlined in the submissions of the plaintiffs, that the defendants, acting under color of state law, engaged in affirmative acts that placed Slade in a position of danger that he otherwise would not have faced, and that the defendants failed to protect him from such danger, thereby resulting in his drowning death on June 14, 2010. The

defendants were aware of the significant risk of harm posed to young children by swimming in a lake of unknown depth, terrain and visibility without the protection of a trained lifeguard. Despite this knowledge, the defendants transported Slade to this hazard, planned and executed activities that placed Slade directly in the hazard, and consciously and deliberately failed to institute precautions mandated by MPS to protect against such hazard. The conduct of the defendants would shock the conscience of any reasonable person and satisfies all the criteria for a substantive due process claim under the state created danger theory. The court should deny the defendants' Motion for Summary Judgement.

## STANDARD OF REVIEW

The manifest purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show there is no genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. <u>Id</u>.

In considering defendants' motion, the court must consider the evidence in the light most favorable to the plaintiffs, according them the benefit of all conflicts in the evidence and all reasonable inferences from the evidence. <u>Id</u>. at 255; <u>Oest v. Illinois Dep't of Corrections</u>, 240

F.3d 605, 610 (7th Cir. 2001). Moreover, summary judgment is notoriously inappropriate for pre-trial disposition of claims in which issues of intent, good faith and other subjective feelings play dominant roles, as is the case here. <u>Alexander v. Wisconsin Dept. Of Health</u>, 263 F.3d 673, 681 (7th Cir. 2001). Simply stated, cases that involve genuine issues of material fact and competing subjective elements are not appropriate cases to be decided on summary judgment. <u>Id</u>. Therefore and as more fully articulated below, the plaintiffs respectfully request that this court deny the defendants' Motion for Summary Judgment.

## LEGAL ARGUMENT

**I.** **THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE CLAIM THAT THE DEFENDANTS VIOLATED THE PLAINTIFFS' RIGHTS UNDER THE FOURTEENTH AMENDMENT.**

The Due Process Clause of the Fourteenth Amendment does place limits on a state's power to act. However, as the defendants correctly point out in their Brief, it generally does not impose upon state actors a duty to protect individuals. <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 195, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). The Court in <u>DeShaney</u> held that, generally, the state is not under a duty to protect individuals from harm by private actors. <u>Id</u>. at 195. The state does, however, assume a duty to protect individuals when the state affirmatively places the individual in a position of danger that he or she would not have otherwise faced. This exception to the general rule in <u>DeShaney</u> is commonly referred to as the "state created danger exception" and is well recognized in the Seventh Circuit. <u>Reed v. Gardner</u>, 986 F.2d 1122 (7th Cir. 1993), <u>Monfils v. Taylor</u>, 165 F.3d 511, 516 (1998), <u>King</u>, 496 F.3d at 817-18 (7th Cir. 2007). In fact, the modern theory of state created danger was developed in the Seventh Circuit even before the Supreme Court's decision in <u>DeShaney</u>. <u>White v. Rocheford</u>, 592 F.2d 381 (7th Cir. 1979), <u>Bowers v. DeVito</u>, 686 F.2d 616, 618 (7th Cir. 1982).

The plaintiffs rely on the "state created danger" exception in advancing their due process claim in the present case.

As stated previously, to recover under the state created danger theory, a plaintiff must demonstrate that: 1) the state, by its affirmative acts, created or increased a danger faced by an individual; 2) the state's failure to protect that individual from such a danger was the proximate cause of the injury to the individual; and 3) the state's failure to protect the individual "shocks the conscience." King, 496 F.3d at 817-18 (7th Cir. 2007). Based on the factual submissions of the plaintiffs in response to the Motion for Summary Judgment, it is clear that triable issues of fact exist with regard to the elements of the plaintiffs' state created danger claim.

### A. There is Sufficient Evidence in the Record of Affirmative Acts by the Defendants that Created or Increased the Danger Faced by Slade

The state creates a dangerous situation or renders an individual more vulnerable to danger "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." Monfils, 165 F.3d at 516-17. The key questions in determining whether state behavior violated the victim's constitutional rights are: 1) what actions did the state actor affirmatively take, and 2) what dangers would the victim otherwise have faced? Paine v. Johnson, 689 F. Supp. 2d 1027 (N.D. Ill. 2010). State created danger cases have been labeled "snake pit" cases based on a colorful Seventh Circuit quote in Bowers, 686 F.2d 616, where Judge Posner explained: "If the state puts a man in a position of danger from private persons and then fails to protect him . . . it is as much an active tortfeasor as if it had thrown him into a snake pit." Id. at 618.

In Monfils, where the state created danger exception was found to apply, an informant notified the police that his co-worker had stolen property from their employer. 165 F.3d at 513.

The police had recorded the informant's phone call. Id. After making the phone call, the informant specifically informed the police department on numerous occasions that he wanted to remain anonymous because his co-worker "was known to be violent." Id. Despite his knowledge of this potential danger, a police officer (Taylor) subsequently disclosed a copy of the tape to the co-worker caught stealing. Id. at 515. When the co-worker played the tape, he recognized the informant's voice, and he and five other co-workers killed the informant. Id. Analyzing the evidence, the court concluded:

> As an experienced police officer, Taylor knew the dangers informants face. Given these facts, it is hard to imagine how the jury could have failed to conclude that Taylor placed Monfils in a position of heightened danger. The evidence is sufficient to uphold that part of the verdict based on Taylor's unconstitutional conduct.

Id. at 520. By releasing the tape, the Court held that the police officer knowingly took an affirmative action that created a danger that the informant would not have otherwise faced. Stated otherwise, but for the act of releasing the taped phone call, the informant would not have faced the danger of his violent co-worker.

In Paine, the plaintiff was a 20 year old woman from California who had travelled to Chicago. While at Midway Airport, she experienced an episode associated with her bi-polar disorder and was taken into police custody. 689 F. Supp. 2d at 1037-39. Even though the plaintiff was still exhibiting erratic behavior, she was released by police into the parking lot of the police station in an unfamiliar high crime neighborhood. Within five hours, she was raped and found outside an apartment building, having fallen from the seventh floor window. Id. at 1051-58. Based on these facts, the court determined that a reasonable jury could find that the officer's actions in releasing the plaintiff placed the plaintiff in a dangerous situation that she would not have otherwise faced. Id. at 1077.

In the pending action, the main argument raised in the defendants' Brief is that the plaintiffs have failed to introduce any evidence that the defendants "affirmatively placed Kamonie Slade in a position of danger that he would not have otherwise faced." See Defendants' Brief, p. 12. This argument is based on a complete mischaracterization and misunderstanding regarding the factual foundation of the plaintiffs' state created danger claim. According to the defendants, "Slades only complain that [the defendants] failed to act to protect Kamonie Slade from the hidden depths of Mauthe Lake." See Defendants' Brief, p. 12. This statement in the defendants' Brief is a simplified and inaccurate characterization of the facts underlying the plaintiffs' state created danger claim. In addition, nowhere in their Brief do the defendants explain how Slade would have been exposed to the danger of unsupervised swimming in a lake of unknown depth, visibility and terrain absent their affirmative acts.

This case is not about the failure of the defendants to act to protect him from a danger not of their making. To the contrary, the defendants engaged in affirmative acts that placed Slade in a danger he would not have otherwise faced. If not for the affirmative acts of the defendants, Slade would never have been at Mauthe Lake on June 14, 2010, let alone swimming in a lake of unknown visibility, terrain and depth without a certified lifeguard on duty to supervise the activity.

Gosz planned and organized the seventh grade field trip for June 14, 2010. Plaintiffs' Proposed Facts ¶¶ 11, 12. As Gosz's supervisor, Estes approved the trip based on the submitted plan. Defendants' Proposed facts ¶16; Plaintiffs' Proposed Facts ¶16. Water activities in the lake were specifically incorporated as part of the planned activities for the field trip and were the main activities going on during the morning of the field trip. Plaintiffs' Proposed Facts ¶¶ 12, 19. The defendants affirmatively sought the permission of the parents of the seventh grade

students to allow their children to play in the water at Mauthe Lake weeks before the actual trip without taking the steps mandated by the school district to ensure student safety. Plaintiffs' Proposed Facts ¶¶ 12, 13.

The defendants were responsible for selecting the location, planning and organizing the activities, and physically transporting the students to the lake. Defendants' Proposed facts ¶¶ 14, 15, 16, 18, 63; Plaintiffs' Proposed Facts ¶¶ 11, 16. Upon arrival at the recreation area, the students were allowed by Gosz to enter a lake of unknown depth, visibility and terrain, in conformance with the activities planned and approved by the defendants, with no lifeguard present in direct violation of school district policies. Plaintiff's Proposed Facts ¶¶ 12, 18, 19; Defendants' Proposed Facts ¶77. These affirmative acts by the defendants placed Slade in a dangerous position that he would not have otherwise encountered. But for the defendants conduct, Slade would never have been at Mauthe lake let alone swimming in the lake without the supervision of a lifeguard on June 14, 2010.

The claim by the defendants that summary judgment is appropriate because there is no evidence that they compelled Slade to enter the water and that Slade "voluntarily" exposed himself to the danger of drowning twists both law and reality. See Defendants' Brief, p. 15. Liability under the state created danger theory does not hinge on the state actor compelling exposure to a danger. All that is required is a showing that the state actor created the danger or made the person more vulnerable to an existing danger. That is exactly what occurred in the present case.

In addition, the assertion that a twelve year old boy attending a school sponsored field trip involving swimming that is planned, organized and approved by his school principal and

assistant principal, voluntarily exposed himself to the danger of drowning is absurd at best. It certainly provides no persuasive argument for summary judgment in the present case.

In their Brief, the defendants cite three cases involving swimming or drowning that they claim support the dismissal of the substantive due process claims alleged by the plaintiffs. See Defendants' Brief, p. 13, citing DeAnzona v. City and County of Denver, 222 F.3d 1229 (10th Cir. 2000), Estate of A.R. v. Grier, 2011 WL 3813253 (S.D. Tex. 2011), and Estate of Healey v. Fletcher, 2009 WL 439954 (D.Or. 2009). Interestingly, none of these cases arise from the Seventh Circuit despite the fact that the Seventh Circuit has a long history of analysis and application of the state created danger theory. In addition, either because of significant differences in applicable law or significant differences in the facts, none of the cited cases provide a reasonable, let alone persuasive or precedential, argument for dismissal of the pending action.

DeAnzona is a case arising out of the Tenth Circuit Court of Appeals. The parents of a young child who drowned while at a city day camp brought §1983 claim based, in part, on a state created danger theory of liability against the City and County of Denver and the director of city parks and recreation. The child had left the vicinity of one counselor and was walking, unsupervised, to two other counselors who were supervising children fishing at the edge of a lake. The child wandered away about 25 yards and fell into the lake and drowned. The court dismissed the substantive due process claims based, in part, on the conclusion that the plaintiffs had only asserted "failure of the counselor in watching [the child] until he joined the other counselors" as the factual predicate for the state created danger claim. 222 F.3d at 1236. The court found allowing the child to walk away unsupervised did not create or increase the otherwise existing risk to the child and rejected the state created danger claim. Id.

Case 2:11-cv-00222-RTR   Filed 04/09/12   Page 13 of 30   Document 26

To state that the facts in <u>DeAnzona</u> are substantively different than the facts in the pending action is to state the obvious. Unlike <u>DeAnzona,</u> the pending action is not grounded on the claim that the government officials near the lake failed to adequately supervise the children at the time of the drowning. To the contrary, the claim in the present case is that the defendants exposed a child to a risk that the child would otherwise not have faced by engaging in a series of affirmative acts, and failed to take the reasonable and mandated steps set forth in MPS policy 7.30 to protect the child. In the pending case, the government officials transported the child to the hazard, planned and organized activities that would place the child directly in the hazard, and consciously and deliberately failed to institute mandatory policies designed specifically to protect the child from the hazard. This case is not about a failure to protect Slade from an existing hazard, it is about government officials that engaged in affirmative acts that recklessly exposed Slade to a hazard. As a consequence, <u>DeAnzano</u> is not persuasive authority on the issue of summary judgment.

<u>Healey</u> is a slip opinion from the United State District Court in Oregon, which is in the Ninth Circuit. In <u>Healey,</u> an adult was carried out by a riptide while swimming in the ocean off the Oregon coast. The estate of the deceased alleged a due process violation based on the claim that the chief of the local fire district refused to call in local water rescue teams to effectuate a rescue. Noting that the deceased had voluntarily exposed himself to the danger of drowning well before any alleged state actor arrived on the scene, the court found no affirmative act sufficient to sustain a state created danger claim. 2009 WL 439954, *3.

The facts in <u>Healey</u> are not analogous to the facts in this case. Healey was an adult who himself travelled to the hazard, placed himself in the hazard, and then alleged a constitutional violation based on a failure by a state actor to rescue him from the hazard. The facts in <u>Healey</u>

are inapposite to the facts in the present case. Slade was a minor transported to the hazard by government actors, placed in the hazard as part of activities planned and organized by government actors who consciously decided not to implement mandatory safety precautions designed specifically to protect children from the hazard. Finally, the affirmative acts that form the foundation for the plaintiffs state created danger claim occurred well before Slade slipped beneath the water and drowned, whereas the alleged unconstitutional acts in Healey occurred afterward. The facts in Healey involved an alleged failure to rescue, which is in no way the foundation for the plaintiffs' claim of state created danger in the present case. Healey, like DeAronza, provides no legal basis for the defendants' Motion for Summary Judgment.

The final authority cited by the defendants in support of summary judgment on the substantive due process claim is Estate of A.R., a slip opinion out of the U.S. District Court for the Southern District of Texas, which is located in the Fifth Circuit. The case involved the drowning death of a 10 year old girl, who suffered from severe hearing loss, during a summer enrichment program at a public swimming pool. Present in the pool area at the time of the drowning were the coach for the boys middle school swim team and the coach for the girls middle school swim team, both of whom were certified in water safety, in CPR and in AED. The young girl, while seated on the edge of the pool, apparently fell into the pool and drowned. 2011 WL 3813253, *2.

The factual differences between Estate of A.R. and the present case are clear. Further, the legal differences between Estate of A.R. and the present case are so significant that it is truly puzzling why the defendants would cite the case in support of their motion for summary judgment. In Estate of A.R., the plaintiffs did not allege a claim of state created danger in their pleadings. That is because in the Fifth Circuit, where the case was venued, the court has refused

to recognize the state created danger theory of recovery under §1983. See Kovacic v. Villarreal, 628 F.3d 209, 214 (5th Cir. 2010). Consequently, in the decision, the court did not analyze whether the facts surrounding the young girl's death satisfy the requirements for a claim of state created danger because such a claim was not recognized in that judicial circuit. Because there is no state created danger analysis in Estate of A.R. it is hard to understand how the decision supports the defendants' Motion for Summary Judgment.

The defendants correctly point out that the plaintiffs in Estate of A.R. attempted to get the federal court to recognize a constitutional violation based an alleged violation of a school policy and local ordinance that required the presence of lifeguards. The plaintiffs undoubtedly did this because they could not allege a claim the state created danger theory of liability. The court rejected the plaintiffs' theory, since a failure to follow state law does not equate to a violation of the Due Process Clause. 2011 WL 3813253, *5. In their brief in this case, the defendants argue: "This court should reject any such argument in this case should the Slades seek to argue that the Board's policy requirement of a lifeguard forms the basis for a constitutional claim." See Defendants' Brief, p. 17. The defendants are apparently concerned about a claim that has never been pled and never been argued. The decision in Estate of A.R. provides no legal support for summary judgment on the state created danger claim.

The plaintiff's constitutional claim is not grounded in the fact that school policy regarding swimming activities were deliberately violated but, rather, is grounded in the fact that government actors, through affirmative acts, created a danger that eventually caused the drowning death of Kamonie Slade. The fact that the violation of school policy is not, standing alone, the foundation of the constitutional claim in this case does not, however, make the school policy or its violation irrelevant to the analysis in this case. The mandatory school policy, and its

deliberate violation, are directly relevant to the nature of the danger associated with unsupervised swimming activities, the individual defendants' subjective knowledge of the danger associated with unsupervised swimming activities, the means by which the defendants could have acted to protect students from the hazard that was created and, finally, the issue of whether the defendants' conduct "shocks the conscience."

The defendants' motion for summary judgment is based on a fundamental misunderstanding and mischaracterization of the factual foundation underlying the plaintiffs' state created danger claim. In their Brief, the defendants assert: "[The defendants] simply failed to act to ensure that a lifeguard was present pursuant to the Board policy but that put Slade in no worse a position than if the Board had "not come up with any [policy] whatsoever." Stated otherwise, the defendants believe that this case is solely about their failure to protect Slade from an already existing hazard. The defendants are blind to the real consequences of their affirmative acts in creating the danger in the first place..

Judge Posner, the same Judge that analogized state created danger cases to a "snake pit," elaborated further on the state created danger theory in his opinion in <u>K.H. v. Morgan</u>, 914 F.2d 846, 848-49 (7th Cir. 1990).

> If the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department. The state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved. . . . There is no duty to rescue a bystander in distress, <u>Yania v. Bigan</u>, 397 Pa. 316, 155 A.2d 343 (1959); <u>Jackson v. City of Joliet</u>, 715 F.2d 1200, 1202 (7th Cir.1983), but having rescued him from certain death you are not privileged to kill him. This is not to say that you assume responsibility for his future welfare. You do not. Our point is only that the absence of a duty to rescue does not entitle a rescuer to harm the person whom he has rescued.

The same logic applies to the case at bar. The fact that the defendants have no constitutionally recognized duty to save Slade from drowning does not mean they are immune from liability when they engage in affirmative acts that result in his drowning. The defendants threw Slade

into a snake pit and they should be held responsible for the violation of the plaintiffs' constitutional rights. The court should deny the defendants' Motion for Summary Judgment.

**B.     There is Sufficient Evidence in the Record of Conduct that "Shocks the Conscience" to Allow this Case to Proceed to Trial.**

The defendants' Motion for Summary Judgment on the state created danger claim is premised solely on an alleged absence of evidence of affirmative acts that created or increased the danger faced by Slade. The defendants do not affirmatively challenge the evidence as it relates to the other two elements of the state created danger theory:  proximate cause or evidence of conduct that "shocks the conscience." King, 496 F.3d at 818. Although the defendants have not raised the issue in their Summary Judgment Motion, the plaintiffs would like to elaborate on the evidence of conduct that "shocks the conscience" that warrants denial of any motion attempting to dismiss the state created danger claim prior to trial.

Conduct by a government actor which "shocks the conscience" is conduct which may be deemed "arbitrary in the constitutional sense." County of Sacramento v. Lewis, 523 U.S. at 850 (citing Collins v. City of Harker Heights, 503 U.S. 115, 129, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)). The inquiry into whether official conduct shocks the conscience in a given case is a necessarily fact-bound inquiry. Lewis, 523 U.S. at 850 (citing Betts v. Brady, 316 U.S. 455, 462, 62 S. Ct. 1252, 86 L. Ed. 1595 (1942)). The Supreme Court has noted that the "shocks the conscience" standard lacks precise measurement, but has stated that the emphasis on whether conduct shocks the conscience points toward "the tort law's spectrum of liability." Lewis, 523 U.S. at 847-48. Mere negligent conduct is not enough, and only conduct falling toward the more culpable end of the spectrum shall be found to "shock the conscience." Id. at 849. Thus, when the circumstances permit public officials the opportunity for reasoned deliberation in their

decisions, the court will find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual. See id. at 851; Armstrong v. Squadrito, 152 F.3d 564, 576-77 (7th Cir. 1998).

### 1. The Risk of Drowning is an Objectively Serious Risk

Applying the "shocks the conscience" standard to the present case, the plaintiffs must introduce evidence that the defendants knew that Slade "was at serious risk of being harmed, [and] decided not to do anything to prevent that harm from occurring even though [they] could easily have done so." Armstrong, 152 F.3d at 577. In order to apply the standard in a meaningful way, it is important to have an understanding of what constitutes a "serious" risk of harm.

In assessing whether a given risk of harm is "serious," the probability of the harm occurring certainly can be a factor in the analysis. Ordinarily the more probable a given risk, the more amenable the risk may be to classification as "serious." However, as the court observed in Boim v. Holy Land Foundation for Relief and Development, 549 F.3d 685 (2008), probability of harm isn't everything:

> The risk that one of the workers on a project to build a bridge or a skyscraper will be killed may be greater than the risk that a driver will be killed by someone who flings rocks from an overpass at the cars traveling on the highway beneath. But only the second risk, though smaller, is deemed excessive and therefore reckless. McNabb v. State, 887 So.2d 929, 974-75 (Ala.Crim.App. 2001) (The first risk might not even be negligent.) As we explained in United States v. Boyd, 475 F.3d 875, 877 (7th Cir. 2007) (emphasis added), "firing multiple shots from a powerful gun ... in the downtown of a large city at a time when pedestrians ... are known to be in the vicinity creates a risk of harm that, *while not large in probabilistic terms,* is 'substantial' relative to the other side is gratuitousness of the defendant's actions.... An activity is reckless when the potential harm that it creates ... is wildly disproportionate to any benefits that the activity might be expected to confer.... The emotional gratification that defendant Boyd derived from shooting into the night, though perhaps great, is not the kind of benefit that has weight in the scales when on the other side is danger to life and limb, even if the danger is limited, as it was here." Lennon v. Metropolitan Life Ins. Co., 504 F.3d 617, 623 (6th Cir. 2007), says that the risk must be "weighed against the lack of social utility of the activity" in adjudging its reasonableness. See also Orban v. Vaughn, 123 F.3d 727, 733 (3d Cir. 1997).

Id. at 695. The risk that arose directly from the affirmative acts of the defendants is the risk that

young children might drown. The risk of a child drowning is "wildly disproportionate" to the social utility of the activities that were planned for the Seventh grade students for the afternoon of June 14, 2010, by the defendants. It cannot reasonably be argued that the risk of young children drowning is not a "serious" risk, considering the defendants' plan to allow young children to swim in the lake without a lifeguard.

The serious risk that one might drown when swimming in a lake of unknown depth, visibility and terrain is inherent and well known. The American Red Cross, in its online pamphlet Where is it Safe to Swim (2012), available on its website at http://www.redcross.org, instructs that "[s]wimming in lakes, rivers and oceans can be safe and fun at a designated swimming area that is protected by lifeguards. However, if these elements are not in place, always assume that any natural body of water is too dangerous for swimming." See Jaskulski Affidavit, Exhibit "L". The Red Cross elaborates on this danger in its instruction pamphlet on Swimming Safely in Lakes, Rivers and Streams (2012), available on its website at http://www.redcross.org:

> Swimming in lakes, rivers and streams can be safe at designated swimming areas that are protected by lifeguards. Swimming in a natural body of water is different from swimming in a pool. More skills and energy are required for natural water environments because of cold water and air temperatures, currents, waves and other conditions—and these conditions can change due to weather.

Jaskulski Affidavit, Exhibit "M". The inherent and well known risk associated with swimming activities in lakes is also illustrated by the very existence of Administrative Policy 7.30, which mandates the presence of certified lifesaving trained personnel, i.e. lifeguards, at all one day field trips that involve any type of swimming activity. Jaskulski Affidavit, Exhibit ""G".

2. <u>There is Evidence that the Defendants Were Aware of the Serious Risk of Drowning and Consciously Disregarded it.</u>

There is evidence that both defendants were aware of the serious risks posed to the children by allowing them to swim in a lake of unknown depth, visibility and terrain without lifeguards present, yet deliberately proceeded with the planned trip in the face of these serious risks in deliberate indifference to the safety of the children, including Slade.

Gosz was aware of the MPS policy on field trips involving swimming activities before the field trip that resulted in the drowning death of Slade. <u>See</u> Plaintiffs' Proposed Facts, ¶8. She also understood that MPS Policy 7.30's mandatory requirement for a lifeguard was based on the risk of serious injury or death associated with allowing children into water unsupervised and that the danger posed to the children was drowning. <u>See</u> Plaintiffs' Proposed Facts, ¶9. The risk was evidenced and reflected in Gosz's conversation with her supervisor, Principal Estes, when Gosz presented the field trip permission slip for approval, which asked for parental permission for the children to "play in the water." Jaskulski Affidavit, Exhibits "C" and "D". According to Principal Estes, when Gosz presented the field trip application and permission slip to her for approval, she advised Gosz to strike from the permission slip any reference to water activities and directed that the "students shouldn't be near the water." <u>See</u> Plaintiffs' Proposed Facts, ¶16. There is ample evidence in the record that Gosz was aware of the serious risks posed to the children by allowing swimming activities in the lake without a lifeguard present, yet consciously chose to do so anyway in direct opposition to school policy, the directives from the school principal and in deliberate indifference to the safety of the children, including Slade.

Principal Estes had been provided a copy of the Board's Administrative Procedure 7.30 dealing with field trips and was familiar with its provisions prior to the field trip that ended in the

death of Slade. Defendants' Proposed Facts, ¶54. Before the drowning, Estes understood that MPS Policy 7.30's requirement for a lifeguard was a safety requirement based on the risk of serious injury or death associated with allowing children into water unsupervised. See Plaintiffs' Proposed Facts, ¶10. Her understanding of the serious risk associated with children swimming in a lake without lifeguards present is well illustrated by her testimony regarding the conversation with Gosz when she was asked to approve the field trip permission slip that referenced children playing in the water:

> Q: And the reason why you didn't want kids in the water is because you don't want kids unsupervised playing in the water?
>
> A. Not necessarily unsupervised. I just-to be honest with you, I'm not comfortable with the kids in the water. I'm just being honest. . . . The part that made me uncomfortable again is the fact that I personally don't like kids in the water because of a personal thing with me . Just being honest. I just don't like it. I'm not—I don't feel comfortable unless there's someone there that I know for sure has a license, is certified, can take all precautions that it wouldn't put the school in harm's way.
>
> Q Okay. And that's – that's what I figured. The thing that made you uncomfortable was kids being in the water without somebody who's licensed and certified because it could put kids in harm's way?
>
> A. Yes

See Plaintiffs' Proposed Facts, ¶16.

Shockingly, Gosz denies this conversation ever took place, and testified there was never any discussion with principal Estes regarding water activities on the field trip before Slade's death. See Defendants' Proposed Facts, ¶17. Regardless of whether one accepts Gosz's testimony, it is clear that Estes was aware well before the field trip of the serious risks associated with allowing students to swim in the lake without lifeguards present. In addition, if swimming activities were not discussed with Gosz before the field trip, Estes clearly knew that they were part of the planned activities based on her approval of the field trip permission slip. Based on the factual submission before the court, there is evidence that Estes, despite knowing the serious risk posed by swimming activities in the lake without a lifeguard, approved the trip anyway in direct

violation of MPS Policy 7.30 and in deliberate indifference to the safety of all the children on the field trip, including Slade.

In addition, the field trip application submitted by Gosz and approved by Estes included a charge to parents for 50 cents for accidental injury insurance. Plaintiff's Proposed Facts ¶ 28. This insurance is encouraged, pursuant to MPS policy, when the students are involved in "riskier" activities, including swimming activities. Plaintiffs' Proposed Facts ¶¶ 26, 27. The parents of the seventh grade students at Roosevelt were charged for this accidental injury insurance even though it was never purchased and it was never offered to the Slade family after the drowning. Plaintiffs' Proposed Facts ¶ 28. The charge for accidental injury insurance is further evidence that the defendants were consciously aware of the hazard posed to the children on the field trip and chose to ignore the hazard in deliberate indifference to the safety of the children.

The circumstances surrounding the planning of the field trip on June 14, 2010 allowed the defendants ample opportunity for reasoned deliberation in their decisions regarding the activities for the trip, the risks associated with those activities, and the best way to eliminate or mitigate those risks. Despite this opportunity, the defendants planned and organized a trip that allowed for swimming in a lake of unknown depth, visibility and terrain without the presence of a lifeguard, which was in direct violation of the safety procedures set forth in MPS Policy 7.30. In so doing, the defendants acted in deliberate indifference of the safety of the students, including Slade, in a manner that shocks the conscience. The court should deny the defendants' Motion for Summary Judgment and allow this case to proceed to a jury on the state created danger claim.

## II.     THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY IN THE PRESENT CASE.

The doctrine of qualified immunity protects government officials performing discretionary functions. Anderson v. Creighton, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 97 L.Ed2d 523 (1987). Specifically, qualified immunity shields officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In determining whether qualified immunity will apply to shield a government official from suit, a court undertakes a two-step inquiry. First, a court must address a threshold question: "whether the plaintiff's allegations make out a deprivation of a constitutional right?" McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010). If the allegations make out a constitutional violation, the court must proceed to step two of the inquiry and determine "whether the right was clearly established." McAllister, 615 F.3d 881. As the Supreme Court has set forth, a right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640.

With regard to the first step in the qualified immunity analysis, the plaintiffs have introduced sufficient evidence to sustain a state created danger claim in the present case. See supra p.p. 5-20. State actors cannot, through affirmative acts, place an individual in a position of danger that he or she would not have otherwise faced. Because the plaintiffs have established evidence sufficient to sustain a claim for violation of their constitutional rights based on the state created danger theory, the primary question with respect to the issue of qualified immunity is "whether the right is clearly established."

The burden with regard to step two in the qualified immunity analysis does not, as alluded to in the defendants' brief, require that the plaintiffs establish the existence of precedent that matches the facts in the present case. While it is true that the defendants must have knowledge of the right, it is not necessary that an earlier case be "on all fours" with this one for the instant case to go to a jury. Montville v. Lewis, 87 F.3d 900, 902 (7th Cir. 1996). Instead, the issue is whether the law provided the defendants "fair warning" that their conduct was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002) (rejecting the Eleventh Circuit standard that a previous case must be "fundamentally similar" to be clearly established) Anderson, 483 U.S. at 640 (citation omitted), refined the concept of "clearly established" in a manner that indicates that the bar is not set at a level that requires factual similarity:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Examining the case law involving qualified immunity in state created danger cases before the Seventh Circuit, it is clear that the defendants are not entitled to immunity in the present case.

In Monfils, the police officer that released the tape of the informant's phone call sought qualified immunity on appeal after the jury found him constitutionally liable at trial under the state created danger theory. The court rejected the proposed qualified immunity defense, even though there was no factually similar precedent:

> In this circuit, a recognition of a claim based on a state-created danger precedes *DeShaney*, which was decided in 1989. In *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), we considered whether police officers may abandon children on the Chicago Skyway after arresting their custodian and depriving them of adult protection. We concluded they could not. We said that "such conduct indisputably breached the Due Process Clause." In other cases, we continued to recognize that a governmental official could, if the circumstances were right, be held responsible for creating a danger in a noncustodial setting. *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988) (*en*

*banc*), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). Our cases recognized that the constitutional right involved was not a right to protection, per se, but rather a right not to be placed at harm by state officials. In a case decided just after the events here, we reviewed the contours of the state-created danger theory and concluded:

> While we have been hesitant to find section 1983 liability outside the custodial setting ... we find that plaintiffs such as the Reeds may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger [than] they otherwise would have been.

*Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir.1993). Taylor clearly created a danger and, by assuring Hitt (the assistant district attorney) that he would make sure the tape was not released but not following through, he created a danger Monfils would not otherwise have faced. Taylor is not and never was entitled to qualified immunity against this claim.

165 F.3d at 518.

In <u>Paine</u>, the police officer responsible for releasing the 20 year old bi-polar woman into the high crime neighborhood outside the police station sought qualified immunity for her acts in a motion for summary judgment. Addressing whether the officer could shield herself from liability based on a qualified immunity defense, the court reasoned:

> When the state affirmatively places an individual in a position of danger that the individual would not have otherwise faced, the state assumes a duty to protect the individual. *See Stevens,* 105 F.3d at 1174; *see also Monfils,* 165 F.3d at 518; *Reed,* 986 F.2d at 1125. Even before the Supreme Court decided *DeShaney,* the Seventh Circuit recognized that the police violate constitutional rights when they create a dangerous situation for an individual and subsequently fail to protect the individual from harm. *See White v. Rochford,* 592 F.2d 381 (7th Cir.1979) (finding allegations stated a claim for constitutional violations when police arrested a man for drag racing and left his passengers, who were young children, stranded on the side of the Chicago Skyway on a cold evening); *Wallace v. Adkins,* 115 F.3d 427, 429 (7th Cir.1997) (state creates "special relationship" and an obligation to provide protection when it "affirmatively places the individual in a position of danger the individual would not have otherwise faced."). It is also clearly established that the act of affirmatively placing someone in a dangerous situation with no reasonable mechanisms for self-help places an individual in a position of danger. *See Wood,* 879 F.2d at 583; *Bowers,* 686 F.2d at 618 (abandoning a person in a position of danger is no less a tort than to throw him into a "snake pit"); *Spence v. Staras,* 507 F.2d 554, 557 (7th Cir.1974) (state prison personnel can be liable under § 1983 when they place a prisoner in a cell knowing he is likely to be a victim of violence by another inmate). Therefore, clearly established law indicated that Heard could not release Eilman from custody in a manner that increased her risk of harm, and Heard is not entitled to qualified immunity for her actions.

689 F.Supp. 2d 1088. The court found that the constitutional right in <u>Paine</u> was "clearly" established based on cases that were factually dissimilar, but which all involved state actors

placing an individual in a position of danger, and failing to protect that individual from the state created danger.

Also instructive on the question of whether the constitutional right in question was clearly established is the case of <u>Ross v. United States</u>, 910 F.2d 1422 (7th Cir.1990), a state created danger case involving the drowning death of a child. In <u>Ross</u>, during a daytime lakefront festival in the City of Waukegan, Illinois, a twelve-year-old boy fell from a breakwater into Lake Michigan and sank. <u>Id.</u> at 1424. The boy's friend immediately ran for help. <u>Id.</u> On-duty emergency personnel at the nearby festival promptly answered the friend's call for help and within ten minutes of the boy's entry into the water, two lifeguards, two firefighters, and one police officer were on the scene with their rescue equipment. <u>Id.</u> Two nearby scuba-diving citizens also offered personal assistance and their boat and equipment. <u>Id.</u> Before anyone attempted to rescue the boy, however, the Lake County Deputy Sheriff ("the Deputy Sheriff") arrived in a patrol boat. <u>Id.</u> He had been directed to prevent any civilian from attempting to rescue a person in danger of drowning in the lake. <u>Id.</u> at 1425. The policy stated that only divers from the City of Waukegan could carry out such a rescue. <u>Id.</u> Pursuant to this policy, the Deputy Sheriff ordered all of the people on the scene to cease their rescue efforts. <u>Id.</u> Twenty minutes after the initial rescuers arrived at the scene, and about thirty minutes after the boy had fallen into Lake Michigan, the officially-authorized divers retrieved the boy's body. <u>Id.</u> The boy was declared dead the next morning. <u>Id.</u>

The boy's mother sued, among other entities, Lake County, the Deputy Sheriff, the City of Waukegan, and the City of Waukegan's Fire Department, Paramedics, and Lifeguards alleging that the Deputy Sheriff violated the boy's civil rights by "interposing state power to prevent rescue" and that the City of Waukegan and Lake County promulgated policies that led the

Deputy Sheriff to prevent the boy's rescue. Id. The district court dismissed the mother's complaint against Lake County and the City of Waukegan Defendants and granted the Deputy Sheriff's motion for summary judgment based on qualified immunity. Id. at 1426. The Seventh Circuit affirmed the district court's judgment as to the City of Waukegan Defendants, but reversed the district court's decisions as to Lake County and the Deputy Sheriff. Id. at 1434.

The Sherriff sought qualified immunity against the claim that he had affirmatively, through his acts, increased the danger to the child by cutting off available means of rescue. In addressing the qualified immunity issue, the court reasoned:

> In 1983, we held that a police officer's failure to pull car accident victims from the burning wreckage was not a deprivation of life in violation of the *fourteenth amendment*, but in the course of that opinion we observed, "If officer Taylor, knowing the car was occupied and wanting the occupants to be burned to death, directed traffic away from the scene in order to prevent any passing driver from saving them, he would be liable." *Jackson v. City of Joliet, 715 F.2d 1200, 1202 (7th Cir. 1983), cert. denied, 465 U.S. 1049, 79 L. Ed. 2d 720, 104 S. Ct. 1325 (1984).* In 1984, we denied a *section 1983* claim for deaths in a fire that occurred when Chicago police officers barred striking firefighters from entering a station house, but we agreed "that the state can deprive a person of life by directly inflicting harm on him or by preventing others from rescuing him." *Jackson v. Byrne, 738 F.2d 1443, 1448 (7th Cir. 1984).* The point of quoting two passages of our dicta is not that we believe Deputy Johnson was an avid reader of the *Federal Reporter* and was aware of these statements. Rather, the passages demonstrate what has always been a fundamental tenet of our constitutional jurisprudence, even before the *DeShaney* and *Archie* decisions: the state cannot arbitrarily assert its power so as to cut short a person's life.

Id. at 1433. In Ross, the court established that a state actor, in the context of a drowning child, cannot cut off available means of rescue after the drowning event and escape liability for the unconstitutional act.

Whether the state actor, like in Ross, cuts off the available means of rescue after the drowning begins or the state actor, as in the present case, creates the hazard by organizing swimming activities in a lake for children and cuts off the means for rescue before the drowning begins, the constitutional right is clearly established under the law. The state cannot arbitrarily exercise its powers so as to cut short a person's life.

In the present case, the plaintiffs have been deprived of constitutional rights that are clearly established in the existing Seventh Circuit precedent on state created danger, including the court's holding in <u>Ross v. U.S.</u> Similar to the conclusions reached by the court in <u>Monfils</u>, <u>Paine</u> and <u>Ross</u>, this court should determine that the defendants are not entitled to qualified immunity on the state created danger claim in this case. The court should deny the Motion for Summary Judgment.

## CONCLUSION

There is no reasonable dispute that allowing a child with little swimming experience to swim in a lake of unknown depth, visibility and terrain, without the presence of a lifeguard creates a serious hazard. There is evidence in the submissions before this court that the defendants transported children to this hazard, planned and organized activities that placed the children directly into the hazard, and consciously and deliberately failed to institute mandatory policies designed specifically to protect children from this hazard. With regard to Kamonie Slade, the defendants were as much active tortfeasors as if they had "thrown him into a snake pit." Their conduct truly shocks the conscience and provides a basis for a claim of state created danger. The Motion for Summary Judgment should be denied, and this case should proceed to trial.

Dated at Milwaukee, Wisconsin this _____9_____ day of ___April___, 2012.

HABUSH HABUSH & ROTTIER S.C.
Attorneys for Plaintiff

BY: _____
Robert L. Jaskulski
State Bar No. 1000561

**P.O. ADDRESS:**
777 East Wisconsin Avenue
Suite 2300
Milwaukee, WI 53202
(414) 271-0900